UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BARRY GILTON, et al.,

            Plaintiffs,

    v.

CITY AND COUNTY OF SAN
FRANCISCO, et al.,

            Defendants.

Case No. 22-cv-07697-WHO

**ORDER GRANTING MOTION TO DISMISS**

Re: Dkt. No. 31

Following a RICO murder case that I tried in 2020, I acquitted plaintiff Barry "Prell" Gilton, who had been convicted of being a member of a violent racketeering enterprise, the Central Divisadero Playas ("CDP"). [1]   Although I found that there was no evidence that Gilton was CDP member, I also concluded that there was no doubt that he participated in the murder of Calvin Sneed.  In this lawsuit, Gilton and his children, Ali Gilton, Barry Gilton, Jr., and Laprell Gilton (collectively, "the plaintiffs"), allege that the City and County of San Francisco, police Sgt. Damon Jackson, and Officer Reese Burrows (collectively, "the defendants") falsified evidence that Gilton was a gang member and maliciously prosecuted him in violation of their civil rights.

The plaintiffs have not plausibly alleged their claims: they have not sufficiently connected the allegedly fabricated evidence at issue to Gilton's indictment, prosecution, detention, or any other due process violation, nor have they adequately alleged that the individual defendants—city police officers—caused Gilton's federal prosecution, or that they did so without probable cause. The plaintiffs' other claims are derivative and depend on a constitutional violation, which has not

---

[1] Unless otherwise noted, any references to "Gilton" in this Order are references to Barry "Prell" Gilton.  If and when I refer to the other plaintiffs who share the same last name, I will use their first and last names.

United States District Court
Northern District of California

been plausibly alleged.  All of the plaintiffs' claims in the First Amended Complaint ("FAC") are DISMISSED with leave to amend.

<div align="center">BACKGROUND</div>

### A.  Procedural History

In 2020, Barry Gilton was tried for VICAR murder and violation of federal anti-racketeering laws in connection with the murder of his daughter's sex trafficker, Sneed.  *See* FAC [Dkt. No. 29] ¶¶ 32, 47, 55.  Although the jury acquitted Gilton of murdering Sneed in aid of racketeering, it convicted him of participating in the affairs of a Racketeer Influenced and Corrupt Organizations Act ("RICO") enterprise: the CDP, a San Francisco gang.  *See* Pls.' RJN [Dkt. No. 34-1] Ex. 3 ("Post-Trial Order") 1:13-20, 2:10-13.[2]  Gilton then moved for judgment of acquittal, which I granted.  *See id*. at 2:12-21.  I determined that although the evidence showed that Gilton had "undeniably participated" in Sneed's murder alongside two known CDP members, the evidence did not allow a rational inference that Gilton's participation in Sneed's murder "contemplated a pattern of racketeering activity as required by RICO."  *Id*. at 1:28-2:17.  "RICO requires a pattern; at least two acts," and Sneed's murder, on its own, did not allow a rational inference that Gilton intended a second racketeering act to occur.  *Id*. at 12:10-17.  The Ninth Circuit affirmed my decision on January 14, 2022.  FAC ¶ 56.

### B.  Plaintiffs' Allegations

On December 6, 2022, the plaintiffs filed this lawsuit, alleging that the defendants fabricated evidence showing that Gilton was a member of the CDP.  Dkt. No. 1.  They allege that Gilton grew up in the city's Fillmore District, raised his family in the Western Addition, and worked in the neighborhood as the athletic director for the Boys' and Girls' Club.  FAC ¶¶ 13-14,

---

[2] The plaintiffs request that I take judicial notice of six documents arising from Gilton's criminal case: the verdict form; his motion for acquittal and new trial, my Orders on those motions, the government's notice of appeal to the Ninth Circuit, and the government's brief for the Ninth Circuit.  *See* Pls.' RJN, Exs. 1-6.  I will do so.  *See* Fed. R. Evid. 201; *see also Huipio v. City of San Jose*, No. 21-CV-07838-SVK, 2023 WL 4409849, at *3 n.2 (N.D. Cal. July 7, 2023) ("Court records are properly the subject of judicial notice.").  That said, I am mindful of the Ninth Circuit's instruction that "a court cannot take judicial notice of disputed facts contained" in matters of public record.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (citation omitted).

<div style="text-align: left; margin-left: 120px;">United States District Court<br>Northern District of California</div>

20, 24.  In 2000, he took another job at the San Francisco Recreation and Parks Department and later became a city bus driver.  *Id.* ¶¶ 25, 28.

Around 2011, Gilton and his longtime partner, Lupe Mercado, became concerned about their 16-year-old daughter, Leticia, who "was having behavior problems at school and was getting into trouble."  *Id.* ¶ 30.  As a result, they moved her to Los Angeles to live with family and finish high school there.  *Id.*  There Leticia met Sneed, described as a "hardened gang member."  *Id.* ¶ 31.  Sneed ultimately forced Leticia into prostitution.  *Id.* ¶ 32.

In early June 2012, Sneed drove Leticia to San Francisco, who arrived unannounced at her parents' house.  *Id.* ¶ 36.  By then, her parents had learned that their daughter "was in an abusive relationship that was concerning her friends."  *See id.* ¶ 33.  When Leticia told her parents that "she would have to soon go," they tried to convince Leticia to stay and "to tell Sneed to leave her alone."  *Id.* ¶ 38.  She told them that she could not "because Sneed had told her many times that if she left, he would hurt her family."  *Id.* ¶ 38.

Gilton left the house and "called on" his cousin, Antonio Gilton.  *Id.* ¶ 40.  When the two met, Gilton told his cousin "what was going on—that Leticia was at home but that a pimp was threatening her to either leave with him or that he would hurt her family."  *Id.*  Antonio Gilton told Gilton that he and a friend, Alfonzo Williams, would go with Gilton back to his house.  *Id.* According to the FAC, "[t]he plan was to have a united front to scare off Sneed in the event he followed through on his promise and went by [Gilton] and [Mercado's] home to force Leticia back to Los Angeles."  *Id.*

Gilton drove his cousin and Williams back to his house and parked about a block away, leaving the two men in his car.  *Id.* ¶ 41.  Gilton went inside and spoke to Mercado and their daughter.  *Id.*  About 45 minutes later, in the early morning hours of June 4, 2012, Gilton left the house and returned to the car where Antonio Gilton and Williams were waiting.  *Id.* ¶ 42.  As Gilton talked to the two men, he "noticed a car drive by with its lights off."  *Id.*  The vehicle stopped in front of Gilton's house before leaving.  *Id.*

"Believing that Sneed was in the car," Gilton, his cousin, and Williams drove after it.  *Id.* ¶ 43.  Gilton, who was driving, allegedly "hoped to confront Sneed to tell him to leave his daughter

1    alone." *Id*. He eventually saw the car, recognized Sneed, and pulled alongside the vehicle. *Id*. ¶

2    44. The FAC alleges that Gilton "yelled out to Sneed that he knew who he was and told him to

3    stay away from Leticia," at which point Sneed got out of his car and began swearing at Gilton and

4    the others. *Id*. The FAC further alleges that before Gilton could react, he "heard more shouting

5    and saw Sneed get back into his car and reach for something." *Id*. Gilton allegedly then heard

6    someone yell, "Gun!" followed by gunfire. *Id*. Gilton sped away. *Id*. "[A]fraid that Sneed was

7    still after them," he drove Antonio Gilton and Williams—neither of whom were harmed—back to

8    where they were staying. *See id*. ¶ 45.

9        When Gilton returned home, police told him that Leticia—who had found Sneed gravely

10   injured and called police—was being questioned. *See id*. ¶¶ 45-46. When Gilton went to pick her

11   up from the police station, he learned that Sneed had been shot and killed. *Id*. ¶ 46.

12       San Francisco police arrested Gilton, Mercado, Antonio Gilton, and Williams for Sneed's

13   murder on June 9, 2012. *Id*. ¶ 47. Gilton was taken into custody and remained jailed. *See id*. In

14   November 2013, the San Francisco District Attorney's Office dismissed its charges against Gilton.

15   *Id*. ¶ 48. At the same time, the United States Attorney's Office filed an indictment against the four

16   under federal anti-racketeering laws. *Id*. ¶ 49. The charges against Gilton included conspiracy to

17   conduct the affairs of an enterprise (the CDP) through a pattern of racketeering activity and

18   murder of Sneed in aid of racketeering. *See* Post-Trial Order at 7:7-21.

19       Gilton denies ever being a member of the CDP but alleges that "because of his extensive

20   contacts and involvement with the community," he "did know kids and even family members who

21   eventually went onto become CDP gang members." FAC ¶ 27; *see also* ¶ 23 (stating that "some

22   of [Gilton's] family members and friends . . . became involved with gangs"). The FAC alleges

23   that the individual defendants "knew or should have known that [Gilton] was not a CDP gang

24   member," but that in an effort to build a case against Antonio Gilton and Williams, "deliberately

25   fabricated evidence and obtained coerced witness testimony to make it appear" that he was and

26   that Sneed's murder "was an act in furtherance of a criminal enterprise." *Id*. ¶ 50.

27       The FAC alleges that the United States tried Gilton on the RICO charges "[a]s a result of

28   defendants' actions." *Id*. ¶ 55. It points to three pieces of purportedly fabricated evidence. The

first is a CDP organizational chart that allegedly "portrayed [Gilton] as a CDP member" and "was used to justify [Gilton's] prosecution and was even introduced [as] evidence at [his] trial." *Id.* ¶ 51. The FAC alleges that the individual defendants "were intimately familiar with the CDP gang" and "knew that said evidence was false and untrue." *Id.*

Second, the FAC alleges that the individual defendants "represented that [Gilton] would frequent a known gang hideout" at an apartment on Steiner Street. *Id.* ¶ 52. According to the FAC, that apartment "was not a known gang hideout, but was in fact [Gilton's] grandmother's house, where, among other people, [Gilton's] family members would visit, including Antonio Gilton." *Id.*

Third, the FAC alleges that the individual defendants "coerced a witness[3], [JB], to testify that all Giltons were important CDP gang members by, among other things, repeatedly threatening [JB] with a long prison sentence if he failed to so testify." *Id.* ¶ 53. The FAC further alleges that the individual defendants "knew, or should have known, that this was not true, especially when [Gilton] was an active community member and an employee for the City and County of San Francisco," and "knew, or should have known" that by threatening JB, "they were employing a technique that would likely yield false information." *Id.*

The FAC alleges that as a result of this fabricated evidence, Gilton "remained remanded and in jail from November 2013, when false federal charges were filed against him, until July 27, 2020"—the day after I granted his motion for judgment of acquittal and he was released from custody. *See id.* ¶¶ 54-55; *see also* Post-Trial Order at 21.

The FAC asserts five claims on Gilton's behalf: section 1983 claims for fabrication of evidence, malicious prosecution, conspiracy, and failure to intervene, along with a *Monell* claim against the City. *Id.* ¶¶ 59-98, 107-112. It also asserts a section 1983 claim for loss of familial relations by three of Gilton's children: Ali Gilton, Barry Gilton, Jr., and Laprell Gilton. *Id.* ¶¶ 99-106. The defendants then filed this motion to dismiss. Dkt. No. 31.[4]

---

[3] All references to this witness shall use "JB", as my Orders and the Ninth Circuit's have done.

[4] The FAC named another defendant, FBI Special Agent Jacob Millspaugh, whom Gilton later voluntarily dismissed from this action with prejudice. *See* Dkt. Nos. 29, 50.

United States District Court
Northern District of California

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts his allegations as true and draws all reasonable inferences in his favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

**DISCUSSION**

**I.      STATUTE OF LIMITATIONS**

The defendants urge that the statute of limitations has run on all of Gilton's causes of action. *See* Mot. to Dismiss ("MTD") [Dkt. No. 31] 4:5-13. Their argument depends on whether the statute began running when Gilton was indicted (2013), when I entered judgment (2020), or when that judgment was affirmed (2022). Because the plaintiffs have not yet plausibly alleged a

6

1    claim, I will not decide this issue today.  That said, I will address it here to help the parties focus

2    on my analysis if it is raised later.

3        "Federal courts borrow from state law to determine any applicable statute of limitations for

4    § 1983 claims." *Lockett v. Cnty. of Los Angeles*, 977 F.3d 737, 740 (9th Cir. 2020).  In California,

5    the statute of limitations for such claims is two years.  *See Mills v. City of Covina*, 921 F.3d 1161,

6    1166 (9th Cir. 2019).  But "the time at which a § 1983 claim accrues is a question of federal law,

7    conforming in general to common-law tort principles." *McDonough v. Smith*, 139 S. Ct. 2149,

8    2155 (2019) (citations and quotations omitted).  The general rule is that accrual occurs "when the

9    plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and

10   obtain relief." *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (same).  "An accrual analysis begins

11   with identifying the specific constitutional right alleged to have been infringed." *McDonough*,

12   139 S. Ct. at 2155 (same).

13       The defendants argue that Gilton's fabrication of evidence and malicious prosecution

14   claims "challenge the legality of his post-process pretrial detention," meaning that they arise under

15   the Fourth Amendment.  MTD at 4:13-5:17.  They contend that Gilton's claims "are akin to false

16   arrest and imprisonment," which accrue "as soon as the allegedly wrongful arrest occurred" or

17   "after the commencement of legal process." *Id*. at 5:18-21.  As a result, they argue, Gilton's

18   claims accrued "at least by the time of his federal indictment in November 2013, if not sooner"—

19   well beyond the two-year statute of limitations. *Id*. at 5:24-6:2.

20       Alternatively, the defendants suggest that Gilton's claims accrued when he was acquitted

21   and released from custody: July 26 and 27, 2020. *Id*. at 6:4-14.  Even then, the defendants argue,

22   his claims are time-barred. *See id*.

23       Gilton accuses the defendants of attempting to rewrite the complaint, insisting that his

24   fabrication of evidence and malicious prosecution claims arise under the Due Process Clause. *See*

25   Oppo. [Dkt. No. 34] 9:4-18, 15:7-9.  He contends that these claims did not accrue until "the

26   government's appeal to the Ninth Circuit resolved in [his] favor," as "[u]ntil that time, the

27   constitutional violations and the wrongful criminal proceedings against [him] were continuing,

28   and the conviction and charges could have been revived." *Id*. at 8:21-24.

7

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The distinction matters: if Gilton's claims arise under the Fourth Amendment, the case law

2    indicates that they accrued when he was no longer subject to pretrial detention.  *See Manuel v.*

3    *City of Joliet*, 903 F.3d 667, 669-70 (7th Cir. 2018) (deciding on remand that a Fourth

4    Amendment claim based on the "constitutional right not to be held in custody without probable

5    cause" accrued when the petitioner was released from custody, as "[t]he wrong of detention

6    without probable cause continues for the duration of the detention"); *see also Valle v. Morgado*,

7    No. 21-CV-05636-EMC, 2021 WL 5507180, at *3-4 (N.D. Cal. Nov. 24, 2021) (noting that "the

8    question of the proper accrual date for a Fourth Amendment claim for unlawful post-process

9    detention . . . remains an open question," finding the Seventh Circuit's reasoning in *Manuel*

10   "persuasive," and finding that "the accrual date for [the plaintiff's] Fourth Amendment claim is

11   the date at which he was no longer detained without probable cause").  But if Gilton's claims are

12   due process claims, they accrued when the criminal proceedings against him terminated in his

13   favor—which Gilton argues is the day that the Ninth Circuit decided the government's appeal.

14   *See McDonough*, 139 S. Ct. at 2154-55 (holding that the statute of limitations for a fabricated

15   evidence claim arising under the Due Process Clause "does not begin to run until the criminal

16   proceedings against the defendant (i.e., the § 1983 plaintiff) have terminated in his favor").

17   It was unclear from the pleadings whether Gilton's claims were asserted under the Fourth,

18   Fifth, or Fourteenth Amendments, as both the fabrication of evidence and malicious prosecution

19   claims invoked all three amendments.  *See* FAC ¶¶ 60, 77.  At oral argument, Gilton's counsel

20   clarified that these were Fourteenth Amendment claims; because this is a motion to dismiss, I

21   accept Gilton's allegations as true and draw all reasonable inferences in his favor.  *See Usher*, 828

22   F.2d at 561.  Assuming—but not deciding—that Gilton's claims arise under the Fourteenth

23   Amendment, then they accrued when the criminal proceedings against him terminated in his favor.

24   *See McDonough*, 139 S. Ct. at 2154-55; *see also Heck v. Humphrey*, 512 U.S. 477, 489 (1994) ("a

25   cause of action for malicious prosecution does not accrue until the criminal proceedings have

26   terminated in the plaintiff's favor") (citation omitted).  Gilton asserts that his

27   
28   
        fabricated evidence and malicious prosecution claims accrued when the
        government's criminal proceedings against him before the Ninth Circuit fully and

8

> finally resolved in his favor and could not be revived.  Until that time, the
> proceedings had not yet terminated.  Not only could the Ninth Circuit have allowed
> a new trial and Mr. Gilton still be prosecuted for the underlying charges with the
> same fabricated evidence, but the Ninth Circuit could have also reinstated the
> conviction.

Oppo. at 14:1-10.

Giving Gilton's argument further weight is my Post-Trial Order conditionally granting his motion for a new trial, and the government's appeal of that order and my judgment of acquittal. *See id.* at 6:13-27 (citing Pls.' RJN, Exs. 4, 6).  I noted in the Post-Trial Order that if the Ninth Circuit disagreed with my analysis of the evidence that Gilton was a member of the CDP, I would set aside the verdict, grant a new trial, and submit the issues for determination by another jury. *See* Pls.' RJN, Ex. 4 at 1:26-2:6.  I further wrote that "[i]n the event the judgment of acquittal is later vacated or reversed, I would grant the motion for a new trial." *Id.* at 2:12-16.  And in the government's appeal to the Ninth Circuit, it argued that "[t]he jury's verdict should be reinstated and the order for a new trial vacated." *See* Pls.' RJN, Ex. 6 at 2.  I agree with Gilton that the criminal proceeding did not resolve in his favor until the Ninth Circuit affirmed my decision; until then, it was possible that his conviction could be reinstated or that he could face a new trial using the same evidence that he now purports was fabricated.  The Ninth Circuit affirmed his acquittal on January 14, 2022, meaning Gilton filed this suit within the two-year statute of limitations applicable to his claims.  *See* FAC ¶ 56.

Based on the current briefing and allegations, it appears that Gilton's claims were timely. As I stated at oral argument, I am willing to revisit this issue after an amended pleading or as case progresses.  But Gilton's claims fail for a different reason: they are not plausibly alleged.

## II.    WHETHER GILTON HAS PLAUSIBLY ALLEGED HIS CLAIMS

Gilton has not sufficiently alleged his fabrication of evidence or malicious prosecution claims.  His derivative *Monell*, conspiracy, and failure to intervene claims fail as a result, as does the loss of familial relations claim.

### A.    Fabrication of Evidence

"To prevail on a § 1983 claim of deliberate fabrication, a plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the

plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017) (citation omitted).  The plaintiff "must first point to evidence he contends the government deliberately fabricated." *Bradford v. Scherschligt*, 803 F.3d 382, 386 (9th Cir. 2015).  He may rely on direct or circumstantial evidence of deliberate fabrication.  *See Spencer*, 857 F.3d at 799.  There are two ways in which a plaintiff can show circumstantial evidence of deliberate fabrication, by demonstrating: (1) "that the defendant continued his investigation of the plaintiff even though he knew or should have known that the plaintiff was innocent"; or (2) "that the defendant used investigative techniques that were so coercive and abusive that he knew or should have known that those techniques would yield false information."  *Bradford*, 803 F.3d at 386 (citations omitted).  These are "methods of proving one element—intent—of a claim that the government deliberately fabricated the evidence at issue."  *Id*.

To establish causation, the plaintiff must show that: (1) "the act was the cause in fact of the deprivation of liberty, meaning that the injury would not have occurred in the absence of the conduct"; and (2) "the act was the 'proximate cause' or 'legal cause' of the injury, meaning that the injury is of a type that a reasonable person would see as a likely result of the conduct in question."  *Spencer*, 857 F.3d at 798.

Gilton's allegations are too conclusory to support his claim and his specific allegations of fabricated evidence—the CDP organizational chart, that Gilton frequented a "known gang hideout" on Steiner Street, and JB's testimony that "all Giltons were important CDP members"— fall short.  *See* FAC ¶¶ 51-53.  To the extent that the chart and JB's testimony were presented at trial, neither caused Gilton's prosecution or pretrial detention.  The FAC does not allege, as defendants note, "what evidence was manipulated (e.g., a report, trial testimony), and where, when, or to whom" any representation about the "known gang hideout" was made.  *See* MTD at 9:12-10:5.

Gilton contends that the chart is "an allegation of direct evidence of fabrication of evidence" because "there was no evidence that [Gilton] was ever a gang member."  Oppo. at 17:20-27.  He further argues that the defendants fabricated this evidence "while knowing that plaintiff was a civilian—a MUNI bus driver with deep ties to the community," thereby "raising the

1    inference that [they had] an unlawful motivation to frame" him.  *Id.* at 18:8-17.

2        The FAC's allegations that the individual defendants "were intimately familiar with the

3    CDP gang," "knew that [Gilton] wasn't a gang member," and continued their investigation

4    anyway, plausibly support the first element of a fabrication of evidence claim.  *See* FAC ¶ 51.  So

5    does the allegation that the individual defendants coerced JB to testify by using a technique that

6    they knew would likely yield false information.  *See id.* ¶ 53.  But Gilton must still plausibly

7    allege causation, both that "the act was the cause in fact of the deprivation of liberty" and "the

8    'proximate cause' or 'legal cause' of the injury."  *See Spencer*, 857 F.3d at 798.  He has not done

9    so.

10       The FAC alleges that the chart was "introduced" as evidence at Gilton's trial, in which

11   case it did not cause Gilton's prosecution or pretrial detention.  *See id.* ¶ 51.  Although the FAC

12   also alleges that the chart "was used to justify [Gilton's] prosecution" and "was used to arrest,

13   detain, and prosecute" him, these allegations are too conclusory to support his claim, as they do

14   not sufficiently detail *how* the chart resulted in his arrest or prosecution.  *See id.* ¶¶ 51, 62(b).

15       The same is true for JB's testimony.  The FAC alleges only that JB *testified* that all Giltons

16   were members of CDP, which implies that he made these statements at trial—particularly since

17   the FAC does not allege that this testimony was presented elsewhere.  *See id.* ¶ 53.  How could

18   that result in Gilton's earlier arrest and prosecution?

19       And the FAC is void of any specific allegations regarding the defendants' "representation"

20   that Gilton frequented "a known gang hideout."  *See id.* ¶ 52.  It does not explain when or to

21   whom the individual defendants "represented" this, nor how it was used in any aspect of the case

22   against Gilton.  *See id.*  Gilton contends that the defendants "misrepresented to the jury that

23   [Gilton's] grandmother's house was a gang hideout," but allegations made in an opposition cannot

24   save his claim.  *See* Oppo. at 18:10-13; *see also Barbera v. WMC Mortg. Corp.*, No. C-04-3738-

25   SBA, 2006 WL 167632, at *2 n.4 (N.D. Cal. Jan. 19, 2006) ("It is axiomatic that the complaint

26   may not be amended by briefs in opposition to a motion to dismiss.").

27       At bottom, the FAC does not plausibly tie the identified evidence to an identified

28   deprivation of liberty.  It is unclear whether Gilton challenges his indictment, his prosecution, his

United States District Court
Northern District of California

11

detention, or something else, and how the above-mentioned evidence caused any of it.  As a result, his fabrication of evidence claim is DISMISSED with leave to amend.[5]

### B. Malicious Prosecution

"To state a malicious prosecution claim under section 1983, a plaintiff must show that the defendant (1) prosecuted plaintiff (2) with malice; (3) without probable cause; and (4) with 'the purpose of denying plaintiff equal protection or another constitutional right.'"  *Heard v. Jackson*, No. 21-CV-09472-JSC, 2022 WL 2356821, at *4 (N.D. Cal. June 30, 2022) (quoting *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 919 (9th Cir. 2012) (en banc)).  The defendants challenge the first three elements of Gilton's claim, arguing that he has not adequately alleged that Jackson or Burrows caused his prosecution, or that they did so with malice and without probable cause. MTD at 11:5-13:21.

### 1. Whether the Individual Defendants Caused Gilton's Prosecution

"Ordinarily, the decision to file a criminal complaint is presumed to result from an independent determination on the part of the prosecution, and thus, precludes liability for those who participated in the investigation or filed a report that resulted in the initiation of proceedings." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004); *see also Washington v. White*, No. 18-CV-00333-WHO, 2018 WL 2287676, at *4 (N.D. Cal. May 18, 2018) (discussing "the rebuttable presumption that a prosecutor exercises independent judgment in deciding to file charges," which, "if not rebutted, protects officers for malicious prosecution claims because of the intervening fault of the prosecutors in the chain") (citations and quotations omitted).  This means that the "[f]iling of a criminal complaint immunizes investigating officers . . . from damages suffered thereafter because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an accused's arrest exists at that

---

[5] As indicated at oral argument, my unrefreshed recollection of the use of the CDP chart, the weight of the evidence regarding the Steiner Street apartment, and the interpretation of JB's testimony, as presented at Gilton's trial and the earlier trial of five CDP members, differs from what is alleged in the FAC.  At this stage of the case, I accept Gilton's allegations as true and draw all reasonable inferences in his favor.  *See Usher*, 828 F.2d at 561.  If Gilton chooses to amend the FAC, I encourage him to carefully review the record to ensure accuracy.

United States District Court
Northern District of California

1    time." *Smiddy v. Varney*, 665 F.3d 261, 266 (9th Cir. 1981), *overruled on other grounds by Beck*

2    *v. City of Upland*, 527 F.3d 853, 865 (9th Cir. 2008).  "However, the presumption of prosecutorial

3    independence does not bar a subsequent § 1983 claim against state or local officials who

4    improperly exerted pressure on the prosecutor, knowingly provided misinformation to him,

5    concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was

6    actively instrumental in causing the initiation of legal proceedings." *Awabdy*, 368 F.3d at 1067.

7        The defendants argue that Gilton has not alleged facts sufficient to overcome the

8    presumption of independent prosecutorial judgment.  MTD at 11:5-25.  They contend that the

9    malicious prosecution claim does not articulate any wrongful conduct that was "actively

10    instrumental" in causing Gilton's prosecution.  *Id.*

11        Gilton glosses over this argument in his opposition, making a blanket assertion that he

12    "pleaded that his prosecution occurred as a result of defendants' actions" and focusing instead on

13    whether he sufficiently pleaded that he was prosecuted with malice and without probable cause.

14    *See* Oppo. at 19:12-19.  In support, he points only to Paragraph 55 of the FAC, which alleges:

15        As a result of defendants' actions, the United States government proceeded to try

16        [Gilton] for VICAR murder and violation of federal anti-racketeering laws.
        Following a full trial, on July 26, 2020, plaintiff was acquitted of all charges

17        against him.  He was released from jail on July 27, 2020.

18    *See id.*; *see also* FAC ¶ 55.

19        Gilton has not plausibly alleged that the individual defendants caused his prosecution.

20    Again, the FAC identifies three pieces of evidence that the individual defendants purportedly

21    fabricated: the CDP chart, that Gilton frequented a "known gang hideout," and JB's testimony that

22    "all Giltons were important CDP gang members."  *See* FAC ¶¶ 51-53.  But the FAC does not

23    allege that the individual defendants presented all of this evidence to a prosecutor or that it was

24    "actively instrumental" in causing the initiation of legal proceedings against Gilton.  The FAC

25    alleges that the defendants "represented" that Gilton would frequent the Steiner Street apartment,

26    but does not say to whom or when those representations were made.  *See id.* ¶ 52.  It alleges that

27    JB was coerced into testifying that "all Giltons" were CDP members, indicating that this evidence

28    was presented at trial—at which point the legal proceedings against Gilton had already begun.  *See*

United States District Court
Northern District of California

13

*id*. ¶ 53.  Although the FAC alleges that the organizational chart "was used to justify [Gilton's] prosecution and was even introduced [as] evidence at [Gilton's] trial," it does not allege any facts that plausibly show, with sufficient specificity, that the defendants presented this chart to a prosecutor and that chart was actively instrumental in causing the initiation of the legal proceedings against Gilton.  *See id*. ¶ 51.

Other allegations in the FAC are too conclusory to save the claim.  Gilton alleges that the defendants "concealed exculpatory evidence showing that [Gilton] was not a gang member, and otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings against [him]."  *Id*. ¶ 78.  This merely mirrors the language in *Awabdy*; the FAC does not provide specific factual allegations supporting these statements.  *See* 368 F.3d at 1067.

Put simply, although Gilton identifies certain evidence that he contends was fabricated, he does not sufficiently connect that evidence to the initiation of legal proceedings against him—just as he does not sufficiently tie it to any deprivation of liberty for his fabrication of evidence claim.  He does not allege that this evidence was presented to the prosecutor or when any such presentation occurred.  His malicious prosecution claim fails.

### 2.  Probable Cause

"[P]robable cause is an absolute defense to malicious prosecution."  *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1054-55 (9th Cir. 2009).  There is also a rebuttable presumption when it comes to probable cause:  "In a federal criminal prosecution, a grand jury finds probable cause.  And, under California tort law, a grand jury indictment creates a presumption in favor of the malicious prosecution defendant that probable cause existed for the underlying prosecution."  *Conrad v. United States*, 447 F.3d 760, 768 (9th Cir. 2006).  "Among the ways that a plaintiff can rebut a prima facie finding of probable cause is by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith."  *Awabdy*, 368 F.3d at 1067.

The grand jury indicted Gilton not once, but three times.  *See* Post-Trial Order at 7:2-9.  Gilton argues that any prima facie finding of probable cause arising from the grand jury

1    indictment is rebutted by his allegations that the defendants fabricated evidence and "only brought

2    federal charges against him to try to pin a case against Antonio Gilton and Alfonzo Williams (i.e.,

3    in bad faith)."  Oppo. at 20:5-15 (citing FAC ¶¶ 49-53, 59-68, 77-90).

4         Gilton's argument fails for many of the same reasons as it did before.  First, the FAC does

5    not adequately allege that the prosecution was induced by the purportedly fabricated evidence: the

6    CDP chart, that Gilton frequented a "known gang hideout," or JB's testimony.  *See* FAC ¶¶ 51-53.

7    Second, the FAC makes only conclusory allegations about other purportedly wrongful conduct,

8    i.e., hiding exculpatory evidence or building a case against Gilton to go after his cousin and

9    Williams.  *See id*. ¶¶ 77-90.

10        In addition, allegations within the FAC plausibly *support* that the defendants had probable

11   cause to believe that Gilton was a member of the CDP and participated in Sneed's murder.  It

12   alleges that some of Gilton's relatives and friends "became involved with gangs" and that Gilton

13   knew "kids and even family members who eventually went onto become CDP gang members."

14   *Id*. ¶¶ 23, 27.  It states that Gilton "called on" Antonio Gilton to help "scare off Sneed," that the

15   two men and Alfonzo Williams followed Sneed's car and confronted him, that Gilton was present

16   when Sneed was shot, and that Gilton drove his cousin and Williams to other locations before

17   returning home.  *See id*. ¶¶ 40-46.  The FAC does not say that Antonio Gilton or Williams were

18   not members of the CDP; indeed, the evidence at trial showed that both men were members of

19   CDP.  *See generally* FAC; *see also* Post-Trial Order at 11:10-22, 12:5-8.

20        Gilton contends that the Ninth Circuit's affirmation of my judgment of acquittal

21   "support[s] the notion that there was no probable cause to arrest [him] on a VICAR charge."

22   Oppo. at 19:25-20:4.  But the burden of proof in a criminal trial is much higher than what is

23   required to arrest or prosecute a person.  *See Wong Sun v. United States*, 371 U.S. 471, 479 (1963)

24   ("It is basic that an arrest with or without a warrant must stand upon firmer ground than mere

25   suspicion, through the arresting officer need not have in hand evidence which would suffice to

26   convict.").  That there was insufficient evidence to support Gilton's conviction does not

27   automatically mean that probable cause was lacking when he was arrested or when the first

28   indictment issued.  The jury and grand jury certainly thought so.

1    Gilton has not sufficiently alleged that the individual defendants acted without probable

2    cause, which is required to state his claim for malicious prosecution.  Because he has also not

3    adequately alleged that these defendants caused his prosecution, the claim is DISMISSED with

4    leave to amend.[6]

5    **C. Remaining Claims**

6    The FAC alleges additional claims: a *Monell* claim (against the City and County of San

7    Francisco), conspiracy, loss of familial relations, and failure to intervene, all arising under section

8    1983.  *See* FAC ¶¶ 69-76, 91-112.  The parties agree that most of these claims—conspiracy, loss

9    of familial relations, and failure to intervene—are derivative claims.  *See* MTD at 15:8-16:3;

10   Oppo. at 23:9-26.  The case law and allegations within the FAC confirm this.  *See Lacey*, 693 F.3d

11   at 935 (stating that conspiracy "does not enlarge the nature of the claims asserted by the plaintiff,

12   as there must always be an underlying constitutional violation"); *Tobias v. Arteaga*, 996 F.3d 571,

13   583-84 (9th Cir. 2021) (stating that "police officers have a duty to intercede when their fellow

14   officers violate the constitutional rights of a suspect or other citizen"); *Shepard v. Perez*, 609 Fed.

15   App'x 942, 942-43 (9th Cir. 2015) ("A failure-to-intervene claim requires an underlying

16   constitutional violation."); FAC ¶¶ 58, 99-106 (alleging that by fabricating evidence and

17   maliciously prosecuting Gilton, the individual defendants violated his constitutional rights and

18   thus violated his children's "constitutional interest to the companionship of their father").  The

19   *Monell* claim requires an underlying constitutional violation as well.  *See Dougherty v. City of*

20   *Covina*, 654 F.3d 892, 900 (9th Cir. 2011) ("A government entity may not be held liable under 42

21   U.S.C. § 1983, unless a policy, practice, or custom of the entity can be shown to be a moving force

22   behind a violation of constitutional rights."); *Yousefian v. City of Glendale*, 779 F.3d 1010, 1016

23   (9th Cir. 2015) ("municipalities cannot be held liable when the individual police officer has

24   inflicted no constitutional injury").

25   _____

26   [6] Because I am dismissing the malicious prosecution claim on these grounds, I need not address
     the parties' arguments about malice.  *See* MTD at 13:13-21; Oppo. at 19:20-20:4.  Although I

27   agree with the defendants that the FAC only makes conclusory allegations that the individual
     defendants acted with malice, Federal Rule of Civil Procedure 9(b) states that "[m]alice, intent,

28   knowledge, and other conditions of a person's mind may be alleged generally."  Regardless, the
     claim fails for the reasons I have described.

Gilton has not adequately alleged that the defendants fabricated evidence or maliciously prosecuted him, and thus has not adequately alleged an underlying constitutional violation. The remaining claims fail as a result. They too are DISMISSED with leave to amend.

### III.     QUALIFIED IMMUNITY

It is possible that qualified immunity will ultimately shield the individual defendants from liability even if plaintiffs are able to assert a plausible claim. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) ("Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."). I cannot determine that now for two reasons. First, additional facts are needed to plausibly state any claim and may impact the qualified immunity analysis. Second, neither party addresses qualified immunity in sufficient detail, mentioning it only in passing. *See* MTD at 1:13-14, 10:20-21, 15:25-28; Oppo. at 18 n.2; Reply [Dkt. No. 38] 6:14-18. If and when the plaintiffs amend their claims, the parties should squarely address both steps of the qualified immunity analysis in any future motion work.

<div align="center">

**CONCLUSION**

</div>

The motion to dismiss is GRANTED with leave to amend in 20 days from the date below.

**IT IS SO ORDERED.**

Dated: August 29, 2023



William H. Orrick
United States District Judge

United States District Court
Northern District of California