UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARRY GILTON, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>    Defendants. | Case No. 22-cv-07697-WHO<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: Dkt. No. 62 |

A jury convicted plaintiff Barry "Prell" Gilton of being involved with others in a conspiracy to conduct the affairs of a criminal enterprise known as the Central Divisadero Playas ("CDP") through a pattern of racketeering activity and acquitted him of murder in aid of racketeering of Calvin Sneed.[1] Gilton participated in that murder, to which the other two participants, both CDP members, pleaded guilty for committing Sneed's murder in aid of racketeering. It takes two racketeering acts to create a pattern, however, and I, as the trial judge, granted Gilton's post-trial motion for acquittal because there was no evidence at trial that he had committed a prior racketeering act. My decision was affirmed on appeal. Now in this lawsuit, Gilton and his children—Ali Gilton, Barry Gilton, Jr., and Laprell Gilton (collectively, "the plaintiffs")—allege that police Sgt. Damon Jackson and Officer Reese Burrows falsified evidence that Gilton was a member of CDP, and that the City and County of San Francisco together with Jackson and Burrows (collectively, "the defendants") maliciously prosecuted Gilton, thus depriving him of his civil rights and depriving his children of familial relations.[2] *See* First

---

[1] Throughout this Order I will refer to Barry Gilton as "Gilton" and any other members of the Gilton family by their first and last names.

[2] The plaintiffs have voluntarily dismissed Special Agent Jacob Millspaugh of the Federal Bureau

1    Amended Compl. ("FAC") [Dkt. No. 29]; Second Amended Compl. ("SAC") [Dkt. No. 57].

2    Accepting the factual allegations of the SAC as true, supplemented by matters on which I
3    am taking judicial notice, I conclude that the allegedly falsified evidence on which Gilton relies
4    does not and cannot plausibly support causation for any claim. The SAC is DISMISSED with
5    prejudice.

**BACKGROUND**

**A.    Plaintiffs' Allegations**

The SAC tells the following story, accepted as true for pleading purposes. Gilton grew up in the city's Fillmore District, raised his family in the Western Addition, and worked in the neighborhood as the athletic director for the Boys' and Girls' Club. SAC ¶¶ 12-13; 19, 23-24. In 2000, he took another job at the San Francisco Recreation and Parks Department and later became a city bus driver. *Id.* ¶¶ 24-27.

Around 2011, Gilton and his longtime partner, Lupe Mercado, became concerned about their 16-year-old daughter, Leticia, who "was having behavior problems at school and was getting into trouble." *Id.* ¶ 29. As a result, they moved her to Los Angeles to live with family and finish high school. *Id*. There Leticia met Sneed, a "hardened gang member." *Id*. ¶ 30. Sneed forced Leticia into prostitution. *Id*. ¶ 31.

In early June 2012, Sneed drove Leticia to San Francisco, who arrived unannounced at her parents' house. *Id*. ¶ 35. By then, her parents had learned that their daughter "was in an abusive relationship that was concerning her friends." *See id*. ¶ 32. When Leticia told her parents that "she would have to soon go," they tried to convince her to stay and "to tell Sneed to leave her alone." *Id*. ¶ 37. She told them that she could not "because Sneed had told her many times that if she left, he would hurt her family." *Id*.

Gilton left the house and "called on" his cousin, Antonio Gilton. *Id*. ¶ 39. Gilton told his cousin "what was going on—that Leticia was at home but that a pimp was threatening her to either leave with him or that he would hurt her family." *Id*. Antonio Gilton told Gilton that he and a

---

of Investigation from the SAC. *See* Dkt. No. 50.

friend, Alfonzo Williams, would go with Gilton back to his house. *Id*. According to the SAC, "[t]he plan was to have a united front to scare off Sneed in the event he followed through on his promise and went by [Gilton] and [Mercado's] home to force Leticia back to Los Angeles." *Id*.

Gilton drove his cousin and Williams back to his house and parked about a block away, leaving the two men in his car. *Id*. ¶ 40. Gilton went inside and spoke to Mercado and their daughter. *Id*. About 45 minutes later, in the early morning hours of June 4, 2012, Gilton left the house and returned to the car where Antonio Gilton and Williams were waiting. *Id*. ¶ 41. As Gilton talked to the two men, he "noticed a car drive by with its lights off." *Id*. The vehicle stopped in front of Gilton's house before leaving. *Id*.

"Believing that Sneed was in the car," Gilton, his cousin, and Williams drove after it. *Id*. ¶ 42. Gilton, who was driving, "hoped to confront Sneed to tell him to leave his daughter alone." *Id*. He eventually saw the car, recognized Sneed, and pulled alongside the vehicle. *Id*. ¶ 43.

Gilton "yelled out to Sneed that he knew who he was and told him to stay away from Leticia," at which point Sneed got out of his car and began swearing at Gilton and the others. *Id*. Before Gilton could react, he "heard more shouting and saw Sneed get back into his car and reach for something." *Id*. Gilton then heard someone yell, "Gun!" followed by gunfire. *Id*. Gilton sped away. *Id*. "[A]fraid that Sneed was still after them," he drove Antonio Gilton and Williams—neither of whom were harmed—back to where they were staying. *See id*. ¶ 44.

When Gilton returned home, police told him that Leticia—who had found Sneed gravely injured and called police—was being questioned. *See id*. ¶¶ 44-45. When Gilton went to pick her up from the police station, he learned that Sneed had been shot and killed. *Id*. ¶ 45.

San Francisco police arrested Gilton, Mercado, Antonio Gilton, and Williams for Sneed's murder on June 9, 2012. *Id*. ¶ 46. Gilton was taken into custody and remained jailed. *See id*. In November 2013, the San Francisco District Attorney's Office dismissed its charges against Gilton. *Id*. ¶ 47. At the same time, the four were indicted by a federal grand jury under federal anti-racketeering laws. *Id*. ¶ 48. The charges against Gilton included conspiracy to conduct the affairs of an enterprise (CDP) through a pattern of racketeering activity and murder of Sneed in aid of racketeering. *See* Post-Trial Order at 7:7-21.

Gilton denies ever being a member of the CDP but alleges that "because of his extensive contacts and involvement with the community," he "did know kids and even family members who eventually went onto become CDP gang members." SAC ¶ 26; *see also* ¶ 22 (stating that "some of [Gilton's] family members and friends . . . became involved with gangs").

The SAC alleges that defendants Jackson and Burrows " "were aware that [Gilton] was not a CDP gang-member" but that in an effort to build a case against Antonio Gilton and Williams, "deliberately fabricated evidence and obtained coerced witness testimony to make it appear" that Gilton was and that Sneed's murder "was an act in furtherance of a criminal enterprise." *Id*. ¶ 49. The SAC asserts that "on or before November 2013 and up to the date of [Gilton's] trial," the defendants "informed federal prosecutors that [Gilton] was a known CDP gang member despite their knowledge to the contrary." *Id.*

The SAC also alleges that federal prosecutors tried Gilton on Racketeer Influenced and Corrupt Organizations Act ("RICO") enterprise charges "[a]s a result of defendants' actions." *Id*. ¶ 53. It points to three pieces of purportedly fabricated evidence. The first is a CDP organizational chart that allegedly "portrayed [Gilton] as a CDP member" and "was used to justify [Gilton's] prosecution and was even introduced [as] evidence at [his] trial." *Id.* ¶ 50. The second is that the individual defendants "represented to prosecutors that [Gilton] would frequent a known gang hideout at 1225 Steiner St., Apt. 502" even though they "knew that statement to be false" because that address was "not a known gang hideout but was . . . [Gilton's] grandmother's house, where . . . [Gilton's] family members would visit, including Antonio Gilton." *Id.* ¶ 51. And the third is that the individual defendants "coerced a witness, [JB], to testify that all Giltons were important CDP gang members by, among other things, repeatedly threatening [JB] with a long prison sentence if he failed to testify." *Id.* ¶ 52. The SAC alleges that the individual defendants "knew, or should have known, that was not true" and "knew, or should have known" that by threatening JB, "they were employing a technique that would likely yield false information." *Id.*

The SAC concludes that "as a result of the false evidence and coerced false witness testimony obtained by [Jackson and Burrows], federal prosecutors brought charges against [Gilton] in November 2013, and [he] remained remanded and in jail from November 2013 . . .

4

until July 27, 2020," the day after I acquitted him *Id.* ¶ 53-54; *see also* Post-Trial Order at 21.

The SAC asserts five claims on Gilton's behalf, all arising under the Fourteenth Amendment: section 1983 claims for fabrication of evidence, malicious prosecution, conspiracy, and failure to intervene, SAC ¶¶ 59-68; 77-90; 91-98; 107-112, a *Monell* claim against the City and County of San Francisco for violations of Gilton's Fourth and Fourteenth Amendment rights, SAC ¶¶ 69-76; and a section 1983 claim for loss of familial relations by three of Gilton's children: Ali Gilton, Barry Gilton, Jr., and Laprell Gilton. The defendants filed a motion to dismiss all claims. Dkt. No. 62.

### B. Judicially Noticed Facts

As the trial judge in Gilton's criminal case and an earlier trial of five CDP members, I am familiar with the evidence presented at trial, the legal positions the parties advanced, and my Orders regarding them. After argument on defendants' motion to dismiss the SAC, I gave notice that I intended to take judicial notice of the order that resulted in Gilton's acquittal, the Order On Barry Gilton and Lupe Mercado's Post-Trial Motions, in *United States v. Gilton and Mercado*, No. 3:13- CR-00764-WHO-1, 2020 WL 4284837 (N.D. Cal. July 27, 2020); *see also* No. 3:13-CR-00764- WHO-3, Dkt. No. 2351 ("Post-Trial Order"), aff'd sub nom. *United States v. Gilton*, 20-10269, 2022 WL 136701 (9th Cir. Jan. 13, 2022). *See* Order on Intent to Take Judicial Notice ("Judicial Notice Order") [Dkt. No. 67]. I specified that I would take notice of the Procedural History section (Post-Trial Order 7:1-8:11), of the fact that Antonio Gilton and Alfonzo Williams admitted their guilt to murdering Sneed in aid of racketeering, and that they admitted that a substantial purpose of the murder was to maintain and increase their position in the enterprise.

I also identified, among other things, the subsection of the Post-Trial Order entitled "Barry Gilton's Connections to CDP." Post-Trial Order 11:7-12:1. There, I recited evidence presented at trial that connected Gilton to CDP in the light most favorable to the government, as I was ruling on a motion to overturn the conviction. The evidence I described in that section included the family home on Central Street, the testimony from JB that the Gilton family was "dominant" and "real respected within CDP," that some Giltons were members of CDP and others did not commit

crimes with CDP, that Gilton had social relationships with several members of CDP, including close ties to the two other participants in the Sneed murder, and that he was seen in various locations and in a video with CDP members. *See id.* And that this all was evidence that the government introduced to persuade the jury to infer that Gilton conspired to violate RICO. That said, I found that no evidence established that Gilton had committed a racketeering act prior to the Sneed murder.

Plaintiffs did not object to my intent to take notice of these facts. Dkt. No. 68. They requested that I also take notice of the Second Superseding Indictment in the case at Docket No. 139, in which the government alleged that Gilton had been a member of CDP since the mid-1990's. I do so.

As in my previous order granting the defendants' motion to dismiss with leave to amend, I take judicial notice of six documents arising from Gilton's criminal case: the verdict form; his motion for acquittal and new trial, my Orders on those motions, the government's notice of appeal to the Ninth Circuit, and the government's brief for the Ninth Circuit. *See* Pls.' RJN, Exs. 1-6; *see also* Order Granting Motion to Dismiss ("Prior Order") [Dkt. No. 54] 2, n. 2.

### C. Procedural History

In 2020, Barry Gilton was tried for VICAR murder and violation of federal anti-racketeering laws in connection with the murder of his daughter's sex trafficker, Calvin Sneed. *See* SAC ¶¶ 31, 46, 54. Although the jury acquitted Gilton of murdering Sneed in aid of racketeering, it convicted him of participating in the affairs of CDP, a racketeering enterprise. *See* Pls.' RJN [Dkt. No. 34-1] Ex. 3 ("Post-Trial Order") 1:13-20, 2:10-13. Gilton then moved for judgment of acquittal, which I granted, and the Ninth Circuit affirmed. *See id*. at 2:12-21; *see also United States v. Gilton*, 20-10269, 2022 WL 136701 (9th Cir. Jan. 13, 2022). I determined that although the evidence showed that Gilton had "undeniably participated" in Sneed's murder alongside two known CDP members, the evidence did not allow a rational inference that Gilton's participation in Sneed's murder "contemplated a pattern of racketeering activity as required by RICO." *Id*. at 1:28-2:17. "RICO requires a pattern; at least two acts," and Sneed's murder, on its

1  own, did not allow a rational inference that Gilton intended a second racketeering act to occur. *Id*.
2  at 12:10-17.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id*. While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *See In re Gilead Scis. Sec. Litig*., 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *See Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

**DISCUSSION**

**II.  THE PLAINTIFFS' CLAIMS ARE NOT TIME BARRED**

42 U.S.C. § 1983 provides a remedy for constitutional violations by persons acting under the color of state law. It provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State.... subjects, or causes to be subjected, any citizen of the United States.... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)) (internal quotation marks omitted).

"Federal courts borrow from state law to determine any applicable statute of limitations for § 1983 claims." *Lockett v. Cnty. of Los Angeles*, 977 F.3d 737, 740 (9th Cir. 2020) (internal citations omitted). In California, the statute of limitations for such claims is two years. *See Mills v. City of Covina,* 921 F.3d 1161, 1166 (9th Cir. 2019). But "the time at which a § 1983 claim accrues is a question of federal law, conforming in general to common-law tort principles." *McDonough v. Smith*, 139 S. Ct. 2149, 2155 (2019) (citations and quotations omitted). The general rule is that accrual occurs "when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (same). "An accrual analysis begins with identifying the specific constitutional right alleged to have been infringed." *McDonough*, 139 S. Ct. at 2155 (same).

Gilton's § 1983 claim alleges Fourteenth Amendment due process violations. *See* SAC ¶ 59-61; Oppo. 7:24-26 ("Here, Plaintiffs have alleged their SAC as a Fourteenth Amendment claim."); *id.* 7:26-8:2 ("[a]lthough claims under both [the Fourth and Fourteenth] amendments are likely viable, Plaintiffs have chosen to allege their claims under the Fourteenth Amendment."). The statute of limitations question is whether his claim accrued when he was acquitted or when the Ninth Circuit affirmed the acquittal.

*McDonough v. Smith* is instructive. McDonough had brought a § 1983 claim alleging that state actors allegedly fabricated evidence against him. The Court held that "[t]he statute of

1  limitations for McDonough's § 1983 fabricated evidence claim began to run when the criminal
2  proceedings against him terminated in his favor—that is, when he was acquitted at the end of his
3  second trial." *McDonough*, S. Ct. at 2154-2161. The Court stated that because his claim was due
4  process claim, he could not bring it under § 1983 "prior to a favorable termination of his
5  prosecution." *Id.* at 2156 (citing *Heck v. Humphrey*, 512 U.S. 477, 480 (1994)). The Court
6  explained that "[o]nly once the criminal proceeding has ended in the defendant's favor, or a
7  resulting conviction has been invalidated within the meaning of *Heck* . . . will the statute of
8  limitations begin to run." *McDonough*, at 2158 (citing *Heck*, 512 U.S. at 486–487).

9  Here, the defendants argue that the criminal proceedings against Gilton "terminated in his
10 favor" when he was "acquitted and released from jail." Mot. 7:19-21. That date was July 27,
11 2020, and this lawsuit was not filed until December 6, 2022, more than two years later. But as I
12 noted in the Prior Order, the pendency of the Ninth Circuit appeal kept the proceedings against
13 Gilton very much alive until the appellate court decided in his favor on January 14, 2022. *See*
14 Prior Order 9:5-18 ("I noted in the Post-Trial Order that if the Ninth Circuit disagreed with my
15 analysis of the evidence that Gilton was a member of the CDP, I would set aside the verdict, grant
16 a new trial, and submit the issues for determination by another jury . . . I further wrote that [i]n the
17 event the judgment of acquittal is later vacated or reversed, I would grant the motion for a new
18 trial."). In its appeal to the Ninth Circuit, the government argued that the jury's verdict should be
19 reinstated and the order for a new trial vacated, which further indicated that the proceedings
20 against Gilton were not yet terminated while the case was on appeal. See Pls.' RJN, Ex. 6 at 2.

21 Until the Ninth Circuit affirmed my decision, it was possible that Gilton's conviction could
22 have been reinstated per the government's request or that he could have faced a new trial using the
23 same evidence that he says was fabricated. Once the Ninth Circuit affirmed his acquittal, these
24 possibilities were foreclosed; the criminal proceedings terminated in his favor.[3] Gilton's claims

---

[3] Defendants ask me to follow the Hon. Edward M. Chen's approach in *Valle v. Morgado*, but that was a different case. There, Judge Chen considered whether a post-process pretrial detention claim was analogous to a § 1983 due process claim for malicious prosecution or instead to a § 1983 Fourth Amendment claim for false arrest and false imprisonment. *See Valle*, 2021 WL 5507190, at *3. That issue was only relevant here when it was unclear whether the plaintiffs were bringing their fabrication of evidence and malicious prosecution claims under the Fourth and Fifth

9

1    asserting due process violations were filed less than ten months from that date and are not time-
2    barred. But they do fail for other reasons.

### III.  NONE OF THE PLAINTIFFS' CLAIMS ARE PLAUSIBLY ALLEGED

#### A.  Fabrication of Evidence

"[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc).[4] To bring a *Devereaux* claim, a plaintiff must first point to evidence that he contends the government deliberately fabricated, *see Bradford v. Scherschligt*, 803 F.3d 382, 386 (9th Cir. 2015), and he must then show that "[the] deliberate fabrication caused the plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017) (citation omitted). He may rely on direct or circumstantial evidence of deliberate fabrication. *Spencer*, 857 F.3d at 799; *see also Caldwell v. City & Cnty. Of S.F.*, 889 F.3d 1105, 1112 (9th Cir. 2018) (same).

There are two ways in which a plaintiff can show circumstantial evidence of deliberate fabrication. He may demonstrate either (1) "that the defendant continued his investigation of the plaintiff even though he knew or should have known that the plaintiff was innocent"; or (2) "that the defendant used investigative techniques that were so coercive and abusive that he knew or should have known that those techniques would yield false information." *Bradford*, 803 F.3d at 386 (citing *Devereaux*, 263 F.3d at 1076).

Further, "[i]n a § 1983 action, the plaintiff must . . . demonstrate that the defendant's conduct was the actionable *cause* of the claimed injury." *Spencer*, 857 F.3d 789, 800 (quoting *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008) (citation omitted) (emphasis added). To establish causation, the plaintiff must show that: (1) "the act was the cause in fact of the deprivation of liberty, meaning that the injury would not have occurred in the absence of the conduct"; and (2) "the act was the 'proximate cause' or 'legal cause' of the injury, meaning that

---

or Fourteenth Amendments.

[4] The Ninth Circuit has referred to such fabrication of evidence claims arising from this right as "*Devereaux*" claims, and I will do the same for ease of reference.

the injury is of a type that a reasonable person would see as a likely result of the conduct in question." *Id.* at 798.

### 1. Gilton has shown circumstantial evidence of deliberate fabrication.

Gilton has sufficiently alleged the first element of a *Devereaux* claim. The SAC alleges that Jackson and Burrows "were aware that [Gilton] was not a CDP gang-member," but that they pursued a case against him despite that knowledge. SAC ¶ 49. Gilton alleges that the individual defendants "provided federal prosecutors with copies of [the allegedly fabricated organizational chart] on or before November 2013 and up to the date of [Gilton's] trial and that they did [so] knowing that said evidence was false and untrue. SAC ¶ 50; Oppo. 16:12-18; that by "repeatedly threatening [JB] with a long prison sentence unless he testified that all Giltons were gang members, they were employing a technique that would likely yield false information," SAC ¶ 52; and that the individual defendants "informed prosecutors that [he] was known to frequent a known gang hideout – his grandmother's house – even though [the individual defendants] were aware that was not a gang hideout." SAC ¶ 51; Oppo. 16:18-20.

This qualifies as circumstantial evidence sufficient to allege deliberate fabrication by the individual defendants. *See Bradford*, 803 F.3d at 386. But I explain next why the judicially noticed facts undercut those allegations and fail to demonstrate plausible causation.

### 2. Gilton has not plausibly alleged causation.

To put this claim into context, Gilton's allegations require that it is plausible that Jackson and Burrows used the fabricated evidence to persuade federal authorities, Special Agent Millspaugh of the FBI and federal prosecutors, to seek the indictment of Gilton and that the evidence was the proximate cause for the injury he alleges (notably, his incarceration until trial). While I am normally hesitant to dismiss a claim based on lack of causation at the pleadings stage, in this case much more is known through judicial notice about the impact of the allegedly fabricated evidence.

Assume the truth of Gilton's allegation that the individual defendants "provided federal prosecutors with copies of said fabricated organizational chart on or before November 2013 and up to the date of [Gilton's] trial" while "knowing that said evidence was false and untrue." SAC ¶

11

50. I took notice of the evidence connecting Gilton to CDP in the Post Trial Order at 11:7 – 12:1, and it is notable by what is not included: no witness identified Gilton as a member of CDP by reference to the organizational chart. Despite the allegation that defendants pressured JB to give false testimony that Gilton was a CDP member, JB did not do so at trial. Gilton also alleges that Jackson and Burrows "represented to prosecutors that [he] would frequent a known gang hideout," even though the individual defendants "knew that statement to be false," as the location in question was actually "[Gilton's] grandmother's house." SAC ¶ 51. To the extent Gilton's grandmother's house was mentioned as a place where CDP members gathered, it was also evident that it was a family home, as indicated in the Post Trial Order.

The government had other evidence of Gilton's involvement with CDP members. For example, Gilton was occasionally present with CDP members at the CDP hangout at 1458 Grove Street; he knew and was friends with various CDP members. Some members of the Gilton family were active members of the CDP, including Gilton's cousin, Antonio Gilton, with whom Gilton had close ties. Post-Trial Order 11:13-14. Gilton was in a rap video that showed him displaying an "Uptown" hand sign alongside several CDP members. Post-Trial Order 11:24-25. None of those facts made him a member of CDP, of course, but he was undisputedly part of a community where many individuals were CDP members and he associated with those individuals regularly. And, more to the point, he participated in the murder of Calvin Sneed with two active CDP members, Antonio Gilton and Alfonzo Williams, who later pleaded guilty to murdering Sneed in aid of racketeering. Post-Trial Order 12:5-7.

The evidence in the preceding paragraph formed the basis of the government's case against Gilton. It is implausible that the three acts of alleged fabrication were a proximate cause its decision to prosecute him. The murder by known CDP members in which Gilton participated and his past relationship with CDP members are obviously material. The organizational chart, JB's testimony, and the portrayal of his grandmother's house are, at best, incidental to the other evidence. Gilton cannot plausibly show that "the act"—here, the purported fabrication of evidence—"was the cause in fact of the deprivation of liberty," much less the "'proximate cause' or 'legal cause' of the injury," *see Spencer*, 857 F.3d at 798, when he was involved in Sneed's

1    murder. He cannot plausibly allege the second element of a *Devereaux* claim based on the
2    asserted fabricated evidence. This claim is DISMISSED with prejudice.

### B.    Malicious Prosecution: There Was Probable Cause To Indict Gilton

"Federal courts rely on state common law for elements of malicious prosecution." *Mills v. City of Covina*, 921 F.3d 1161, 1169 (9th Cir. 2019), cert. denied sub nom. *Mills v. Covina, CA*, No. 19-321, 2019 WL 5150535 (U.S. Oct. 15, 2019). "To state a malicious prosecution claim under section 1983, a plaintiff must show that the defendant (1) prosecuted plaintiff (2) with malice; (3) without probable cause; and (4) with 'the purpose of denying plaintiff equal protection or another constitutional right.'" *Heard v. Jackson*, 2022 WL 2356821, at *4 (N.D. Cal. June 30, 2022) (quoting *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 919 (9th Cir. 2012) (en banc)).

"Ordinarily, the decision to file a criminal complaint is presumed to result from an independent determination on the part of the prosecutor, and thus, precludes liability for those who participated in the investigation or filed a report that resulted in the initiation of proceedings." *Heard*, 2022 WL 2356821, at *4 (quoting *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004) (internal citations omitted)). However, this presumption of prosecutorial independence does not bar a subsequent § 1983 claim against state or local officials who "improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was *actively instrumental* in causing the initiation of legal proceedings." *Id.* (citing *Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1126–27 (9th Cir. 2002)) (emphasis added). Of course, "to be entitled to the presumption of truth, allegations in a complaint . . . may not simply recite the elements of a cause of action, but must contain sufficient allegation of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

The SAC alleges that the individual defendants provided the federal prosecutors with the fabricated evidence. For the reasons discussed in the prior section, the SAC has not plausibly alleged the second element of malicious prosecution: that Gilton was prosecuted without probable cause.

"[P]robable cause is an absolute defense to malicious prosecution." *Lassiter v. City of*

13

*Bremerton*, 556 F.3d 1049, 1054-55 (9th Cir. 2009). "In a federal criminal prosecution, a grand jury finds probable cause . . .[and] a grand jury indictment creates a presumption in favor of the malicious prosecution defendant that probable cause existed for the underlying prosecution." *Conrad v. United States*, 447 F.3d 760, 768 (9th Cir. 2006). This presumption is rebuttable: "[A] plaintiff can rebut a prima facie finding of probable cause . . . by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith." *Awabdy*, 368 F.3d at 1067.

Gilton was indicted by a federal grand jury three times. *See* SAC ¶ 48 (noting that the United States Attorney's Office indicted the plaintiff, alongside three other defendants, under federal anti-racketeering laws); *see also* Prior Order at 14. He was convicted by a jury for being a CDP member. Defendants are entitled to a presumption that probable cause existed.

Although Gilton does not allege that the fabricated evidence was used with the Grand Jury, his lawyer said at oral argument that he has not received transcripts of those confidential proceedings. The indictment alleged that Gilton had been a CDP member since the 1990's. I assume the truth of Gilton has alleged with respect to fabricated evidence, but for the reasons just discussed, it is insufficient to rebut the presumption.[5]

The allegations in the SAC and the judicially noticed facts support that there was probable cause to believe that Gilton was a member of the CDP and a participant in the murder of Calvin Sneed. He had admitted relationships with CDP members. Some of his relatives and friends had "bec[ome] involved with gangs," and he "called on" his cousin, Antonio Gilton—a member of CDP—when he found out that his daughter was in trouble with Sneed. *See* SAC ¶¶ 22, 39; *see also* Post-Trial Order at 11:10-22, 12:5-8. Gilton was present when Sneed was murdered and he

---

[5] Gilton directs my attention to *Washington v. White*, 2018 WL 2287676-WHO (N.D. Cal. May 18, 2018) but that case does not help him. There, I granted a motion to dismiss § 1983 claims, including malicious prosecution, in part because the plaintiff failed to show that there was no probable cause for her arrest. *Id.* at *4-5. A plaintiff may rebut a prima facie finding of probable cause by showing that a criminal prosecution was induced by fabricated evidence or other wrongful conduct undertaken in bad faith. *See Washington*, 2018 WL 2287676, at *4 (quoting *Awabdy*, 368 F.3d 1062, 1067). But in *Washington*, I determined that the plaintiff had not plausibly alleged such wrongful conduct, and therefore could not overcome the presumption of probable cause. Similarly, Gilton's *Devereaux* claim is implausible and does not rebut probable cause for his arrest and prosecution.

14

drove away from the scene with his cousin and Alfonzo Williams in his car. SAC ¶¶ 42-44. While this evidence was insufficient to establish that Gilton had committed a racketeering act prior to the Sneed murder, it served as probable cause for his prosecution as a member of CDP. If Gilton had not participated in Sneed's murder, there would not have been probable cause to prosecute him as a CDP member. But given the facts here, as alleged and noticed, there was ample probable cause to proceed.

Finally, Gilton argues that the Ninth Circuit's affirmance of my decision that he had not committed a racketeering act prior to the Sneed murder "support[s] the notion that there was no probable cause to arrest [him] on a VICAR charge." Oppo. 18:16-20 (citing *United States v. Gilton*, Nos. 20-10269, 20-10344, 2022 U.S. App. LEXIS 1117, at *4 (9th Cir. 2022)). But the appellate court's affirmance of my decision to acquit Gilton of RICO charges does not show that the defendants lacked probable cause for the indictment on RICO-related charges. As I said in the Prior Order, the burden of proof in a criminal trial is significantly higher than what is required for law enforcement officers to arrest someone, or for a prosecutor to indict someone. *See Wong Sun v. United States*, 371 U.S. 471, 479 (1963) ("It is basic that an arrest with or without a warrant must stand upon firmer ground than mere suspicion, through the arresting officer need not have in hand evidence which would suffice to convict."). Participation in the murder of Sneed, together with Gilton's prior relationships with CDP members, provided probable cause to indict.

Gilton cannot plausibly allege that the defendants prosecuted him without probable cause. As this is an essential element to his malicious prosecution claim, that claim necessarily fails. It is DISMISSED with prejudice.

### C. Derivative Claims

The plaintiffs' derivative claims fail. The parties agree that Gilton's children's claims for loss of familial association are derived from his *Devereaux* and malicious prosecution claims. *See* Mot. 17:10-26; Oppo. 22:2-23:5. The same is true for Gilton's conspiracy and Failure to Intervene claims. *See* Mot. 17:3-9; Oppo. 21:20-26. Because Gilton has failed to plausibly allege the underlying claims, the plaintiffs' derivative claims necessarily fail and are DISMISSED with prejudice.

15

### D.      *Monell* Liability

While local governments typically may not be sued under § 1983 for injuries inflicted solely by their employees or agents, municipalities may be held liable under § 1983 when an official policy or custom causes a constitutional violation.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91, 694 (1978).  A plaintiff must plausibly plead the following to proceed with a *Monell* claim: "(1) that [he] possessed a constitutional right of which he was deprived; (2) that the municipality had a policy, custom, or practice; (3) that the policy, custom, or practice amounted to deliberate indifference to [his] constitutional rights; and (4) that the policy, custom or practice was the moving force behind the constitutional violation." *Torres v. Saba*, No. 17-CV-06587-SI, 2019 WL 111039, at *6 (N.D. Cal. Jan. 4, 2019) (citing *Plumeau v. School Dist. #40 County of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)); *see also AE ex rel. Hernandez v. County of Tulare*, 666 F.3d 631, 636 (9th Cir. 2012).  Cities cannot be held liable for the acts of individual police officers when those officers have not inflicted a constitutional injury. *See Yousefian v. City of Glendale*, 779 F.3d 1010, 1016 (9th Cir. 2015).

Here, the plaintiffs' complaint does not support an inference of *Monell* liability against the City and County of San Francisco.  It fails the first element of the *Monell* test—Gilton has not plausibly alleged an underlying constitutional violation.  In this case, on these facts, *Monell* liability does not arise.

### CONCLUSION

The motion to dismiss is GRANTED with prejudice and the plaintiffs' claims are DISMISSED.

**IT IS SO ORDERED.**

Dated: February 8, 2024

William H. Orrick
United States District Judge